**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REPUBLIC LEASING COMPANY,
<u>Plaintiff-Appellee,</u>

v.

RESTAURANT EQUIPMENT MARKETING
SPECIALISTS, INCORPORATED,
<u>Defendant-Appellant,</u>

and

COLONIAL PACIFIC LEASING
CORPORATION; MARK A. KERRUTT,
<u>Defendants,</u>

No. 98-2414

AMSTAT CORPORATION, d/b/a
American States Leasing,
<u>Defendant &</u>
<u>Third Party Plaintiff,</u>

v.

UNIVERSAL HOSPITALITY
CORPORATION; ULTRA-VEND,
INCORPORATED; R. JOSEPH COSTANZO,
JR.,
<u>Third Party Defendants.</u>

Appeal from the United States District Court
for the District of South Carolina, at Columbia.

Joseph R. McCrorey, Magistrate Judge.
(CA-96-3132-3-19BC)

Argued: September 22, 1999

Decided: December 30, 1999

Before TRAXLER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and Joseph R. GOODWIN,
United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Lionel John Postic, POSTIC & BABB, L.L.C., Marietta,
Georgia, for Appellant. Robert P. Wood, ROGERS, TOWNSEND &
THOMAS, P.C., Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this diversity action, defendant Restaurant Equipment Marketing
Specialists, Inc. ("REMS") appeals various rulings of the district court
made before, during, and after a trial in which the jury awarded plain-
tiff Republic Leasing Company ("Republic Leasing") actual and puni-
tive damages for negligent misrepresentation under South Carolina
law. We affirm.

I.

This dispute arose from a business venture into "food courts" by
Universal Hospitality, Inc. ("Universal"), a company already in the
business of operating airport restaurants. In the fall of 1994, Universal

decided to expand its airport restaurant business into the mall food court business. To finance the venture, Universal obtained short-term, high-interest financing for up to $1.5 million from Enterprise Financial Corporation ("Enterprise"), giving Enterprise a blanket security interest in all assets, then owned or later-acquired, of Universal.

In connection with the initial project, a mall food court in Tuscola, Illinois (the "Tuscola project"), Universal ordered approximately $110,000 in restaurant equipment from defendant REMS and made a $60,000 down payment. In connection with this sale, REMS prepared invoice #8124, directed to Universal, which reflected the total purchase price, the down payment, and a balance due of approximately $50,000. The equipment was delivered and installed in Tuscola and, pursuant to the financing agreement, Enterprise received a security interest in the equipment.

Intending for the Enterprise loan to be only a "bridge" loan, Universal soon began to seek permanent financing at a more attractive interest rate. It seemingly attained this goal through Amstat Corporation ("Amstat"), which gave Universal a written commitment to provide $1.7 million in permanent financing for its expanded business venture.

In February 1995, and in an apparent attempt to meet part of its financial obligation to Universal, Amstat asked REMS to prepare an invoice listing equipment totaling $49,970. REMS complied, issuing invoice #8232. The requested invoice included the equipment which had previously been invoiced to Universal, but reflected the ship-to address as being Hartsfield Airport in Atlanta, Georgia, the sold-to entity as being Amstat, and the shipping date as being February 13, 1995. No such equipment was sold to Amstat, however, or shipped to Hartsfield Airport, and the amount of the new invoice matched the amount due for the Tuscola project under the original invoice to Universal.

With new invoice in hand, Amstat made the equipment the subject of a lease between Universal and Amstat, which was, in turn, assigned to Colonial Pacific Leasing Company ("Colonial Leasing") -- an equipment leasing company willing to purchase and lease the equipment to Universal. In return, Colonial Leasing issued a check to

3

REMS for the amount due under the false invoice. REMS applied the $49,970 in Colonial funds to the original invoice issued to Universal for the Tuscola equipment, which was still subject to the security interest of Enterprise.

A similar plan was then instituted to obtain approximately $150,000 from Republic Leasing. According to Republic Leasing, Universal was pressuring Amstat for more money so that Universal could pay off the expensive bridge loan to Enterprise and rid itself of the short-term financier. In February 1995, Amstat obtained from Universal a list of all equipment that Universal had purchased for the Tuscola project, regardless of the identity of the vendor. The list included, but was not limited to, the equipment already twice-invoiced by REMS. Nevertheless, REMS prepared a third invoice totaling $149,987 -- Invoice #8324. This invoice was provided to Republic Leasing, who sent a check directly to REMS for the total amount due and received an assignment of a lease agreement for the equipment entered between Amstat and Universal. Although the check itself did not bear Republic Leasing's name, the check was sent via Federal Express, in an envelope marked with Republic Leasing's name, address, and telephone number. Upon receipt, REMS negotiated the check, applied approximately $1,300 to the outstanding balance of the original Universal invoice, and refunded the balance of approximately $148,600 directly to Universal as an"overpayment from lease company." J.A. 1034-35.

The end result was that REMS obtained a payoff of its original invoice to Universal and Amstat was able to meet approximately $150,000 of its additional financing commitment to Universal. The result was achieved, however, by virtue of the false invoices generated by REMS in conjunction with Amstat. The bookkeeper for REMS, who prepared the invoice paid by Republic Leasing, testified that he did so at the direction of the president of REMS and that he assumed the invoice was necessary to "keep the paperwork going on getting the funding." J.A. 1019. The president of REMS denied any knowledge of this false invoice, whereas the president of Amstat testified that REMS knew the invoice was going to be used to obtain financing.

Eventually, in late 1995 or early 1996, Universal fell into default under its lease with Republic Leasing and Republic Leasing declared

4

all sums due and payable. It was at this point that the scheme unraveled. Republic Leasing learned that Colonial Leasing had paid the second REMS' invoice for $49,970, which included some of the same equipment that was included in the third REMS' invoice paid by Republic Leasing. Republic Leasing and Colonial Leasing then agreed to cooperate on the sale of the equipment, which netted $34,764, and the proceeds were escrowed. Republic Leasing then learned that the property was not only the subject of the invoices paid by it and by Colonial Leasing, but that it was also the subject of the security interest held by yet another company -- the successor in interest to the short-term financier Enterprise-- pursuant to the first invoice. Accordingly, the escrowed proceeds were turned over to this first holder of the security interest.

Republic Leasing initially brought an action against Amstat and Colonial Leasing. Subsequently, Republic Leasing deposed the president of REMS and filed an amended complaint adding Amstat's president, Mark Kerrutt ("Kerrutt") and REMS as defendants. Having abandoned its claim to any interest in the proceeds of the sale, Colonial Leasing was eventually dropped from the lawsuit. Amstat, which brought in Universal and several of its affiliated parties (collectively "Universal") as third-party defendants, obtained a default judgment against them, and thereafter settled with Republic Leasing by agreeing to pay $100,000 pursuant to a two-year payment schedule and to confess judgment in the amount of $288,681.34.

This left these claims of Republic Leasing against REMS: (1) breach of warranty of title; (2) breach of contract; (3) civil conspiracy; (4) fraud; and (5) negligent misrepresentation. Essentially, the case boiled down to the fact that Republic Leasing, based upon an invoice created by REMS, believed that it had purchased nearly $150,000 in restaurant equipment which it had leased to Universal for the latter's food court venture. However, $110,000 of the equipment was the subject of the original invoice issued by REMS to Universal, $49,970 of the equipment was the subject of both the original invoice sent to Universal and the second invoice generated by REMS and sent to Colonial Leasing; and approximately $40,000 of the invoiced equipment was never sold to Universal by REMS in the first place.

5

The magistrate judge granted summary judgment to REMS on Republic Leasing's claims of breach of warranty and breach of contract, and the remainder of the claims were tried to a jury.[1] Following a six-day trial, the jury returned a verdict for REMS on the claims of civil conspiracy and fraud, but for Republic Leasing on the claim for negligent misrepresentation. The jury awarded actual damages of $150,000 and punitive damages of $150,000. Post-trial motions were denied and this appeal followed.

II.

We review the decision of the district court to deny judgment as a matter of law de novo. See Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir.), cert. denied, 68 U.S.L.W. 3106 (U.S. Oct. 4, 1999) (No. 99-180). In so doing, we must view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in its favor without weighing the evidence or assessing the witnesses' credibility. See Sales v. Grant, 158 F.3d 768, 775 (4th Cir. 1998).

III.

A.

REMS first contends that the district court erred in denying its motion for judgment as a matter of law on Republic Leasing's claim for negligent misrepresentation. We disagree.

In order to establish a claim for negligent misrepresentation under South Carolina law, the plaintiff must prove that:

> (1) the defendant made a false representation to the plaintiff;
>
> (2) the defendant had a pecuniary interest in making the statement;

---

[1] The district court referred the case to the magistrate judge by consent for all proceedings and trial.

(3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff;

(4) the defendant breached that duty by failing to exercise due care;

(5) the plaintiff justifiably relied on the representation; and

(6) the plaintiff suffered a pecuniary loss as the proximate result of reliance on the representation.

Fields v. Melrose Ltd. Partnership, 439 S.E.2d 283, 285 (S.C. Ct. App. 1993). We also look to Section 552 of the Restatement (2d) of Torts, which provides additional guidance in cases where the representation is not made directly to the plaintiff. It provides as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1977); see ML-Lee Acquisition Fund, L.P. v. Deloitte & Touche, 489 S.E.2d 470, 471 n.3 (S.C. 1997)

7

(adopting Section 552 as the law in South Carolina in negligent misrepresentation cases).

Asserting that Republic Leasing failed to prove that REMS knew Amstat wanted the false invoice for the purpose of obtaining money from Republic Leasing, or that REMS knew about Republic Leasing at all, REMS contends that it is entitled to judgment as a matter of law on Republic Leasing's negligent misrepresentation claim. This is because, the argument goes, Republic Leasing failed to prove that REMS made a direct representation to Republic Leasing, failed to prove that Republic Leasing was the intended recipient of the $149,987 invoice, and failed to prove that Republic Leasing was within a class of individuals the invoice was designed to influence. In this regard, REMS also asserts that its receipt of payment of the false invoice was not sufficient to place it on specific notice of Republic Leasing's existence because, although the envelope had Republic Leasing's name on it, the check did not. We are unpersuaded, to say the least. REMS, a distributor of restaurant equipment, prepared a false invoice at Amstat's request listing equipment that it had already sold to Universal, and for which it had been partially paid, as well as for equipment that had been sold to Universal by other vendors. There was evidence that REMS knew that Amstat needed the false invoice for funding purposes and, of course, REMS received a check in full payment of the admittedly false invoice, in an envelope marked with Republic Leasing's name, but proceeded to negotiate the check and "refund" the "overpayment" to Universal. Under the circumstances, we are satisfied that the evidence supported the jury's verdict in favor of Republic Leasing on its claim for negligent misrepresentation.

REMS' alternative argument is dispensed with even more easily. REMS attempts to assert that it is entitled to judgment as a matter of law because Republic Leasing failed to prove that the invoice contained a representation that no other person had a security interest in, or lien on, the equipment securing the lease funded by Republic Leasing. The "invoice" apparently did not say whether or not it had been paid, nor whether any other entity had a security interest in the property. However, there was nothing to alert the buyer to the fact that the invoice was for a transaction that never took place and, we believe, the conclusion that the invoice was for an unpaid bill for unencum-

8

bered property or goods is certainly consistent with the common understanding of invoices.

Accordingly, we find no error in the district court's refusal to grant judgment as a matter of law to REMS on Republic Leasing's claim for negligent misrepresentation.

B.

REMS next contends that the district court improperly allowed the jury to award actual damages which were not proximately caused by REMS' conduct. Specifically, REMS contends that Republic Leasing should have been limited to actual damages in the amount of $34,764 -- the amount of funds that Enterprise received as a result of its original security interest. This limitation is required, REMS asserts, because Republic Leasing would have suffered its additional damages whether or not REMS had generated the false invoice.

The flaw in REMS' argument is that the evidence fully supported a finding that, absent the false invoice, Republic Leasing would have suffered no damages. As a result of the false invoice prepared by REMS, Republic Leasing issued a check for $149,987 for payment of the invoice in return for assignment of the leasing agreement between Universal and Amstat. Accordingly, the evidence supported the conclusion that the false invoice proximately resulted in the issuance of the full amount of the check. Accordingly, we find no error in the district court's refusal to limit damages to the amount recovered from the actual sale of the equipment, or in its refusal to remit the verdict for actual damages.

C.

REMS next contends that the district court erred in allowing the jury to award punitive damages, asserting that punitive damages are not recoverable in a negligent misrepresentation case as a matter of law. We disagree.

In order for Republic Leasing to recover punitive damages under South Carolina law, "there must be evidence [that REMS'] conduct

9

was wilful, wanton, or in reckless disregard of[Republic Leasing's] rights." McCourt v. Abernathy, 457 S.E.2d 603, 607 (S.C. 1995); see F. Patrick Hubbard & Robert L. Felix, The South Carolina Law of Torts 364 (2d ed. 1997) (noting that under South Carolina law governing negligent misrepresentation cases, "[p]unitive damages would appear to be allowed where defendant is also reckless"); cf. Lengel v. Tom Jenkins Realty, Inc., 334 S.E.2d 834, 837 (Ct. App. 1985); Pittman v. Galloway, 313 S.E.2d 632, 634 (S.C. Ct. App. 1984). Wilful, wanton, or reckless conduct constitutes "`[a] conscious failure to exercise due care,'" id. (quoting McCourt, 457 S.E.2d at 607), "committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiffs rights," Nesbitt v. Lewis, 517 S.E.2d 11, 15 (S.C. Ct. App. 1999). Evidence of such conduct must be "clear and convincing." S.C. Code Ann. § 15-33-135 (Law. Co-op. Supp. 1998). Here, there was substantial evidence on the record to support the award of punitive damages. Furthermore, the fact that the jury found for REMS on Republic Leasing's fraud claim is not dispositive. The nine specific elements required to prove fraud under South Carolina law[2] differ from those necessary to prove a claim for negligent misrepresentation, and plaintiff must prove every element of fraud by "clear, cogent and convincing evidence." Charleston Lumber Co., Inc. v. Miller Hous. Corp., 458 S.E.2d 431, 436 (S.C. App. 1995). Accordingly, the jury could have concluded that Republic Leasing failed to prove each of the nine elements of fraud by clear, cogent, and convincing evidence, but that plaintiff did prove that REMS' conduct was

_____

[2] In order to establish a claim of fraud in South Carolina, the plaintiff must prove:

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

Charleston Lumber Co., Inc. v. Miller Hous. Corp. , 458 S.E.2d 431, 436 (S.C. App. 1995).

10

sufficiently willful, wanton, or reckless to warrant the imposition of punitive damages.**3**

D.

REMS' next two issues on appeal arise from the settlement agreement entered between Republic Leasing and Amstat during the pendency of the suit. We reject them as well.

First, the original agreement between Republic Leasing and Amstat contained language releasing all other jointly liable businesses. REMS did not participate in the settlement, but nevertheless contends that it is entitled to the benefit of the release. We disagree.

REMS did not plead accord and satisfaction as an affirmative defense, see Fed. R. Civ. P. 8(c), nor did it raise this issue until post-trial motions. And, it appears, these failures are unsurprising. It is undisputed that the parties to the settlement agreement did not intend to release REMS from the pending claims against it, see Scott by McClure v. Fruehauf Corp., 396 S.E.2d 354, 356 (S.C. 1990) (noting that "[t]he release of one tortfeasor does not constitute a release of others who contributed to the plaintiff's injuries unless the parties intended such a release or the plaintiff received full satisfaction"), and the settling parties later executed a modified release which specifically reserved all claims that the plaintiff had against REMS, Universal, and the principals of these non-settling defendants. Accordingly, REMS was not entitled to dismissal on this basis.

Second, REMS claims is that it is entitled to a set-off against the $150,000 actual damages verdict against it for the amounts paid and payable under the settlement agreement between Amstat and Republic Leasing. Specifically, under that agreement, Amstat agreed to pay $100,000 over a two-year period, and to execute a confession of judgment in the amount of $288,681.34 which could be filed when and if

_____

**3** For example, the jury could have concluded that Republic Leasing proved the first five elements of fraud, which speak directly to REMS' conduct, by clear, cogent, and convincing evidence, but that Republic Leasing either failed to prove one or more of the remaining four elements or only proved them by a preponderance of the evidence.

11

Amstat failed to make the agreed-upon payments. REMS contends that it is entitled to a set-off in the amount of the present-day value of $100,000 -- the full amount owing under the agreement. The district court denied the motion. We affirm.

Under South Carolina law, REMS is entitled to a pro tanto reduction in judgment for the same cause of action, see Atlas Food Sys. & Serv., Inc. v. Crane Nat. Vendors, Inc., 99 F.3d 587, 596 (4th Cir. 1996); see also Powers v. Temple, 156 S.E.2d 759, 761 (S.C. 1967), a rule "rest[ing] on the almost universally held [principle] that there can be only one satisfaction for an injury or wrong." Atlas, 99 F.3d at 596 (internal quotation marks omitted) (second alteration in original). At the time REMS made a request for a set-off, there had been no satisfaction of any part of the $150,000 judgment rendered against it. Accordingly, at the time the request was made, the district court did not err in refusing to grant a set-off to REMS. We express no opinion, however, as to whether REMS would now be entitled to a set-off; this is a matter which can be addressed by the district court when and if it becomes an issue.

E.

The final issue on appeal concerns the lower court's award of attorney's fees. When added as a defendant in this case, REMS initially moved to dismiss the complaint on the grounds that it had no contacts with the State of South Carolina and, therefore, that South Carolina lacked personal jurisdiction over it. Additionally, REMS denied contacts with the state in discovery responses.

Republic Leasing, following an investigation into REMS' business contacts within the state, moved to compel truthful answers to its discovery requests propounded on the issue of personal jurisdiction, and moved for sanctions. REMS then admitted that the court had personal jurisdiction over it, abandoned its jurisdictional motion, and answered the complaint.

At the conclusion of the trial, the court awarded Republic Leasing attorney's fees in the amount of $6,472.59 for REMS' discovery abuse under Rule 37(a)(4)(A), which provides that if a motion to compel discovery is granted, or discovery is provided as a result of

12

the motion, the court may award "reasonable expenses incurred in making the motion, including attorney's fees." REMS appeals this award, contending that, while Republic Leasing was entitled to recover attorney's fees incurred in preparing the motion to compel, it was not entitled to recover attorney's fees incurred as a result of efforts to ascertain the falsity of REMS' discovery responses.

We find no error. Even if we were to conclude that"reasonable expenses incurred in making [a] motion [to compel]" under Rule 37(a)(4)(A), do not include expenses associated with ascertaining the basis for the motion, we are satisfied that the magistrate judge, under the circumstances, possessed the inherent power to award those expenses pursuant to Rule 26(e), which mandates that a party correct any disclosure known to be materially incorrect. See Buffington v. Baltimore County, 913 F.2d 113, 132-33 n. 15 (4th Cir. 1990). Accordingly, we affirm the lower court's award of attorney's fees and expenses.

IV.

For the foregoing reasons, the judgment of the district court is hereby affirmed.

AFFIRMED

13